In the Matter of the Accounting of ROCHESTER TRUST AND SAFE DEPOSIT COMPANY, as Executor of RUTH C. H. FITCH, Deceased, Respondent.

AGNES B. CURTIS, Appellant.

Fourth Department, November 14, 1945.

*Charles S. Wilcox* and *Nicholas E. Brown* for appellant.

*E. Willoughby Middleton* for respondent.

LARKIN, J.   Ruth C. H. Fitch died in the city of Rochester, N. Y., November 8, 1942, leaving surviving her husband and three daughters, one of whom is the claimant herein. Her will was admitted to probate November 17, 1942.   The respondent trust company is the executor.   On September 9, 1943, Agnes B. Curtis, claimant-appellant, presented a verified claim against her mother's estate for $154,992.47, principal indebtedness, and a balance of interest accrued thereon up to January 1, 1937, of $58,181.98.   This claim was duly rejected on September 14, 1943.   Thereafter the executor filed its intermediate account, which disclosed a gross estate, at the time of Mrs. Fitch's death, of $577,399.01.   All parties interested in the estate, including this claimant, either waived service of

citation or appeared on the intermediate accounting. In connection with the accounting the surrogate heard and determined the rejected claim, and by his written decision of February 7, 1944, disallowed it except to the extent of a loan made by claimant to decedent on January 15, 1937, in the sum of $3,539.20, with interest thereon from January 15, 1937. From that portion of the surrogate's decree on the intermediate settlement, which disallowed the claim except to the extent noted, claimant appealed to this court. The will, which would disclose the beneficiaries, their relationship to decedent, and the amounts given them, is not a part of the record.

To support her claim Mrs. Curtis called the former secretary of her mother, who had served her as secretary and bookkeeper from 1914 to the time of Mrs. Fitch's death. After decedent's death the secretary was employed in a similar capacity by another of Mrs. Fitch's daughters. Claimant also called a public accountant of the city of Rochester, who was employed by decedent in the early Fall of 1936 to audit the books of account which her secretary had been keeping for her during the period of her employment, and to install an adequate system of bookkeeping which would truly reflect, at all times, decedent's net worth. This accountant, who apparently also specialized in income tax work, prepared Mrs. Fitch's income tax returns for the years 1937, 1938 and 1939.

In connection with the oral testimony of these two witnesses claimant placed in evidence copies shown by the oral testimony to be exact copies of decedent's income tax returns, Federal and State, for the year 1937, together with a record of claimant's loan account as shown by her mother's books, from January 1, 1937, to the time of decedent's death, and also a number of trial balances from the books as installed by the accountant January 1, 1937, and kept thereafter by the secretary.

The executor called as witnesses another married daughter and, also, the husband of decedent. Their testimony in no way impaired or contradicted that given by decedent's auditor and former secretary, and such as was disclosed by the books of account.

From all of the testimony the following facts, with the permissible and reasonable inferences to be drawn therefrom, were fully established: Commencing March 23, 1925, claimant made sixty loans to her mother, varying in amount from $101.25 to $7,541.50. Loans were made every year commencing March 23, 1925, and ending with the loan of October 10, 1936. The total was $151,453.29. These loans had been

entered by Mrs. Fitch's secretary in the books of account which her secretary kept for her prior to January 1, 1937. Early in the Fall of 1936, Mrs. Fitch employed the public accountant, one of claimant's witnesses, to make an audit of her books and advise as to proper bookkeeping methods. In the course of this audit of the books, as they were then kept by the secretary, the accountant found the record of these loans made by the daughter to her mother. He then discussed the matter with decedent, her secretary, and evidently with Mrs. Fitch's son-in-law, a stock broker having an office in the city of Rochester.

In December, 1936, a conference was held in the son-in-law's office. At this conference were the decedent, her son-in-law, a married daughter, the accountant, his assistant and her secretary. The principal subject discussed was these loans made by claimant to her mother. The accountant had with him a transcript taken from the, then, books of the decedent showing these sixty loans, with the dates and amounts of each. Mrs. Fitch examined the statement, and after examining it, stated, in substance, that the balance of $151,453.29, as shown by the statement, was the amount in which she was then indebted to her daughter, and she directed that in the books, which the accountant was to install, the total amount of these loans be entered as a liability. Following this conference and as of January 1, 1937, under the direction of the accountant, an improved bookkeeping method was installed which included, at least as a part of it, the keeping of a general ledger, in which was entered all of decedent's assets and liabilities. One of the accounts so entered in that ledger was captioned " Agnes B. Curtis Loan." Under date of January 1, 1937, following the notation " To record loans made by Mrs. Curtis in varying amounts and various dates from 3/23/25 to 10/19/31 " (the date " 31 " was explained by the secretary as a mistake on her part and was intended to be " 36 ") $151,453.29, entered in the column designated as " Credits ". On January 15, 1937, Mrs. Curtis made a further loan to her mother of $3,539.20, which also was entered in the credit column of the same account, and under the amount previously entered in that column, of $151,453.29. The total was then carried into the column of the account marked " Balance ", as $154,992.49. The ledger sheet containing this account is in evidence. Although there is no direct testimony of the fact, nevertheless the other exhibits fully warrant the inference that, at the time the loan account was entered, another account was opened in the same general ledger

known as the " Agnes B. Curtis Acc. Int.". In the credit column of that account, under date of January 1, 1937, was entered the total of the interest accrued on each loan from its date to January 1, 1937, amounting to $60,040.33. The opening of an interest account would be consonant with proper accountancy methods, and is indicated by the exhibits. Following the installation of the new system of bookkeeping the secretary thereafter made all entries in decedent's books. She prepared for the decedent, from the general ledger, trial balances each month. A number of these were put in evidence. Decedent examined some, if not all, of them.

In the trial balance as of June 1, 1937, under the heading " Notes Payable " are listed three obligations, one to the Lincoln Alliance Bank of Rochester of $155,000.00, one to Agnes B. Curtis, $153,134.14, and the other, Agnes B. Curtis account interest, $60,040.33. The entry of the two Curtis accounts as " notes payable " is highly significant. In the trial balance as of September 12, 1938, under " Notes Payable " are listed Lincoln Alliance Bank, $119,745.83, Agnes B. Curtis, $154,992.49, and Agnes B. Curtis account interest, $58,181.98. The seeming change in the Agnes B. Curtis loan account and interest account from June 1, 1937, to September 12, 1938, will be explained later. All the trial balances in evidence commencing with the month of March, 1941, and continuing monthly thereafter until that of October 31, 1942, carry the Agnes B. Curtis loan as a liability in the amount of $154,992.49, and the Agnes B. Curtis interest account as of $58,181.98.

On March 15, 1937, decedent, evidently knowing — although there is not a particle of testimony as to how she found it out — the amount of claimant's Federal income tax due on that date, directed her secretary to send decedent's check to the Collector of Internal Revenue for her daughter's Federal income tax payment due that day, amounting to $767.46. On April 14th she similarly directed her secretary to pay claimant's State income tax, amounting to $1,090.89. The total of these two payments, $1,858.35, was then entered by the secretary on the decedent's books as a debit against the Agnes B. Curtis indebtedness as shown on these books. The fact that decedent had paid claimant's income taxes, Federal and State, and that claimant's account had been debited with such payment was then communicated by the secretary to the claimant. Whether the Agnes B. Curtis loan account was first debited with this payment, or the interest account, is not clear, either from the secretary's oral testimony, or that of the accountant. Exhibit

7 for identification might indicate that the secretary first credited the balance of the loan account, as shown by the books, $154,992.49, with these payments, and subsequently made a correcting entry debiting the interest account. That might explain the difference in these two accounts as shown by the trial balance of June 1, 1937, and that of September 12, 1938.

When, in March and April, 1938, decedent filed her own income tax returns with the Federal and State governments she took credit, as a deduction, on account of interest paid to Agnes B. Curtis, for the exact amount of these income tax payments so made by her for her daughter in March, 1937. Both of these returns were signed by Mrs. Fitch. They were prepared for her by the accountant who had audited her books.

'Nowhere in the record is there a suggestion of senility or incompetency of decedent. In fact the business character of her investments would indicate the contrary.

The learned surrogate, in his decision, held that, of the sixty-one loans, all those made prior to the year 1931, amounting to $88,141.65, were outlawed on April 14, 1937. He further held that the account was not a mutual, nor a stated one. However he credited the income tax payments on the loan made January 5, 1931, thereby reducing it to $1,912.40, which, added to the total of the other loans made thereafter, up to and including January 1, 1937, amounted to $64,992.49. He determined that since the last of these loans was made October 20, 1936, the bar of the statute fell as to them on October 19, 1942, with the result that, applying the credit as he did, on the loan of January 5, 1931, he determined that all of the loans antedating January 1, 1937, were outlawed in the lifetime of the testatrix. He held, however, as to the loan made January 15, 1937, due to the fact that the period of limitation, as to it, was extended for eighteen months from the date of the death of the testatrix, November 8, 1942, the claim was valid and enforcible to that amount, only, with interest thereon from January 15, 1937.

While we hesitate to disagree with so learned and experienced a surrogate as the one who determined this matter, we reach the conclusion that he did not take as liberal a view of the testimony as we feel is warranted. After all, an examination of the decisions involving the Statute of Limitations, as to debts of the instant character, leads one to the conclusion that each case must, in the final analysis, be determined on its peculiar facts.

With the surrogate's finding that this was not a mutual account, but one made up of divisible items, we are in agreement. Again, it is probably true that the mere entry of the amount of these loans on the decedent's books as of January 1, 1937, as the total indebtedness then owing by her to her daughter, and the debiting of claimant's loan account with the further loan of January 15, 1937, and carrying the total forward as a balance of $154,992.47, and the computation of interest on the various loans to January 1, 1937, and entering as a fixed balance the amount $60,040.33, as interest due, were each insufficient, in and of itself, to make of this loan transaction an account stated. Still it comes perilously close to it. All that is lacking is some evidence that the claimant acquiesced in these totals. That the decedent, the debtor, fully intended these entries to disclose the exact amount of principal and interest due her daughter on January 1, 1937, cannot be gainsaid. She had caused these loans, from their very inception, to be entered in such books as her secretary was then keeping for her, giving the dates and the exact amounts. Evidently in the Fall of 1936, when she employed the certified public accountant to audit her books, she wanted installed for her a bookkeeping system which would truly reflect her net worth, and by means of which monthly trial balances could be made showing, on the one side, the total value of all her assets, and on the other, her liabilities, so that, adding the liabilities to the net worth, as shown on the first of the month, she could tell quickly whether her financial condition was improving or failing. Evidently Mrs. Fitch was a woman of business experience. Although it does not definitely appear, it may be inferred that the auditor discussed with her son-in-law, the stock broker, the matter of these loans. He, a business man, knowing that entries were to be made in the new set of books definitely installed for the very purpose of reflecting truly his mother-in-law's financial condition, wanted to be sure, as the accountant so testified, that she thoroughly understood the situation. A conference, in the nature of a family one, followed in December, 1936, in his office. There the decedent, the debtor, examined the account, saw the amount of it as totaled, and there, in substance, stated that the account was correct. As a business woman she must have known that the setting up in her books of these accounts, with the balances, principal and interest, as shown in those accounts, was a mute admission of her liability to her daughter, as then existing obligations to the amounts so entered. Thereafter, frequently she saw statements taken

from her books which disclosed in unmistakable language the principal account and the interest account as existing liabilities. For nearly seven years such trial balances were prepared, and some of them at least, examined by her. After she had made the payment of her daughter's income taxes in 1937, and, in 1938, had taken as a deduction against her income in 1937, in both Federal and State returns, interest paid to her daughter, the trial balances persistently reflected the crediting of the Agnes B. Curtis interest account as same accrued up to January 1, 1937, on the various loans, with the exact amount of these two payments. She must have observed the reduction in the interest account. Never once did she question the correctness of her books. As far as the decedent, alone, could do, she made the loan transaction a stated account as of January 1, 1937. With even a scintilla of evidence that her daughter, the creditor, acquiesced in her statement of the condition of the principal and interest·items, there would be no difficulty in reaching the conclusion that these entries, as made, coupled with the oral testimony, established an account stated of this loan transaction.

Assuming, however, for the purposes of this discussion, that these entries, coupled with all the attendant circumstances, do not make of this transaction an account stated, still these books are admissions on the part of the decedent that she was owing to her daughter, of principal, on January 1, 1937, $151,453.29, and interest thereon to January 1, 1937, of $60,040.33, and that on January 15, 1937, her daughter loaned her the further sum of $3,539.20, and that she, the decedent, intended all these loans to bear interest from the date they were made. Conceding, also, that these admissions are insufficient to bar the running of the statute as to the loans made prior to March 15, 1937, still the admissions in the books, coupled with the oral testimony, are seemingly sufficient to establish a part payment by this debtor of either the principal indebtedness of $154,992.47, or of the interest account of $60,040.33, the total amount of the interest on all the loans to January 1, 1937, computed exactly, and which the books themselves disclose was the interest account, attached as an incident of the principal debt. That the payments were made is undisputed. That either the principal amount of debt or the interest account of the loan was credited with these payments, and that the payment and crediting were made known to the creditor, is again fully established by the testimony of decedent's secretary. That the decedent, herself, was aware of the allocation of these income tax payments as a credit against interest on account of all the loans to January

1, 1937, is, again, fully established. That it was the decedent's intention so to do is again made clear by the fact that in the Federal and State income tax returns filed by her in the year 1938, for the year 1937, she took credit for these tax payments as payments of interest to her daughter. The only indebtedness from her to her daughter was that shown by these two accounts on her books. It cannot be presumed that decedent willfully and intentionally took this deduction from her income for the year 1937, unless she knew and intended that the payments were payments of interest. These payments were not deductible from income unless they were payments of interest, and since the only interest which she owed her daughter was that shown by her books, which had accrued up to January 1, 1937, on the various loans made to her by claimant, it seems indubitably established, both by the credit given this particular interest account in carrying forward the balance as a balance of interest, and taking as a deduction in 1938, of this amount as interest paid to her daughter, that these income tax payments for Mrs. Curtis were payments on account of interest on the principal debt shown by decedent's books to be due to her daughter on January 1, 1937.

Nor does it make any difference in the determination of this litigation whether the payments were credited against the total principal indebtedness, or the total interest of $60,040.33. Section 59 of the Civil Practice Act, requiring the acknowledgment to be in writing signed by the party to be charged, expressly provides that the section does not alter the effect of payment of principal or interest. The general rule is, that the payment of interest on a debt is an acknowledgment, from which a promise to pay the principal obligation may be implied, and operates to keep the debt alive for the statutory period from that time (34 Am. Jur., Limitation of Actions, § 349). This rule is recognized in this State (*Mills* v. *Davis et al.*, 113 N. Y. 243; *Clute* v. *Clute*, 197 N. Y. 439, 449). It is therefore quite apparent that the basic question herein relates simply to the character of the payment, and whether as made it was a lump sum payment of a specific debt.

The principle upon which a party making a payment takes a debt out of the Statute of Limitations is that the party paying intends, by it, to acknowledge and admit the greater debt to be due. It is strictly the intention of the debtor which must be considered. If the debtor did not have in mind to do this the running of the statute will not be stopped by reason of a part payment. Bearing in mind that the part payment must be made

and accepted as a part of a particular indebtedness and under circumstances which will warrant the unmistakable inference that the debtor recognizes the whole debt as an existing liability, thus indicating an intention to pay the balance, a part payment in and of itself does not have the effect of tolling the statute. Herein, we are dealing with a part payment which either must be treated as a part payment on the total principal obligation of $154,992.47, or on the total interest thereon accrued up to January 1, 1937, as both may be deemed, by reason of the entries made in decedent's books, to have been existing debts at the time the payments were made March 15 and April 15, 1937. It must, probably, be conceded that claimant's proof was insufficient to show a written acknowledgment within the meaning of section 59 of the Civil Practice Act. The single question, therefore, is whether these tax payments made by decedent for her daughter can be held to have been made — and to have been so intended by Mrs. Fitch — so that they show recognition of a definite debt, a portion of which it may be conceded was outlawed at the time the payments were made. The rule as stated in *Crow* v. *Gleason* (141 N. Y. 489, 493) is: " In order to make a money payment a part payment within the statute, the burden is upon the creditor to show that it was a payment of a portion of the admitted debt, and that it was paid to and accepted by him as such, accompanied by circumstances amounting to an absolute and unqualified acknowledgment by the debtor of more being due, from which a promise may be inferred to pay the remainder. Part payment of a debt is not of itself conclusive to take the case out of the statute. In order to have that effect it must not only appear that the payment was made on account of a debt, but also on account of the debt for which action is brought, and that the payment was made as a part of a larger indebtedness, and under such circumstances as warrant a jury in finding an implied promise to pay the balance. If it be doubtful whether the payment was a part payment of an existing debt, more being admitted to be due, or whether the payment was intended by the party to satisfy the whole of the demand against him, the payment cannot operate as an admission of a debt so as to extend the period of limitation. If there be a mere naked payment of money without anything to show on what account, or for what reason the money was paid, the payment will be of no avail under the statute. The payment must be made under such circumstances as to show a recognition of a larger debt remaining unpaid." This latter part of this quotation from the opinion of Judge EARL in *Crow*

v. *Gleason* (*supra*) is explained in *Jefferson County National
Bank* v. *Dewey* (181 N. Y. 99, 106). Judge O'BRIEN, writing
the prevailing opinion, after quoting that part of Judge EARL's
opinion, states: "It will be noticed that the authorities cited
by the learned counsel for the defendants on this question deal
with cases where payments were evidenced by entries upon
books kept by the parties, where a long account was involved
and where the purpose of the payments was obscure or doubt-
ful. We do not think that the principle stated has any applica-
tion to the case at bar. The partial payments were made by
the defendants upon the note in question; there was no dispute
about the amount of it or about the payments made." More-
over it is undoubtedly the rule that where reliance is placed
upon a part payment to take a debt, outlawed at the time the
payment was made, out of the Statute of Limitations, more
evidence is required to start running a new Statute of Limi-
tations than would be required as to a debt not barred. The
underlying base of such a rule may be that a payment made on
a debt which is not outlawed can well be treated as influencing
the future action of the creditor, which would not be true as to
a debt outlawed. Nevertheless the part payment, if the inten-
tion of the debtor be to recognize the outlawed debt as an exist-
ing obligation, is just as effective as if it were not barred. This
rule is recognized in *Lawrence et al.* v. *Harrington* (122 N. Y.
408) and in *Brooklyn Bank* v. *Barnaby* (197 N. Y. 210, 224).
In considering the purpose and intention with which a part
payment is made, oral testimony is admissible. Herein we
have not only the oral testimony of decedent's secretary and
her accountant, but, in addition, we have the admissions found
in her own books. As to the books of decedent, we are not here
confronted with a situation as is disclosed in *Adams et al.* v.
*Olin et al.* (140 N. Y. 150, 159–161). In that case it was held, in
substance, that the entries were valueless, because it did not
appear that they had been directed by the decedent, nor for that
matter, that he knew anything about them. No such situation is
found in the instant record. On the contrary this decedent knew
all about the entries in her books. It was she who directed the
original entries to be made showing the total indebtedness,
principal and interest, which were set up in her books installed
January 1, 1937. Monthly trial balances were taken from these
books for more than six years before her death. These she
examined. Even a person of ordinary intelligence — the testi-
mony herein warrants a finding that this decedent was better
than that, and indeed was a woman of considerable business

experience, and although perhaps advanced in years, neither senile nor incompetent — knowing, as did the decedent, that her books of account showed the sum total of this indebtedness, and as she must have known, the amount which had been paid on account of the daughter's income taxes in 1937, could tell by a glance at these trial balances that the payments so made had been allocated as a part payment on the entire obligation. The conclusion is inescapable that it was so allocated at her direction, because the testimony of her secretary is that she never questioned the correctness of her books as reflected in the trial balances.

Concededly the testimony warrants the finding that in December, 1936, at the family conference, the decedent then treated the amount of loans which had been made by her daughter to her, up to that time, as an existing obligation and that the total amount of them was then due from her to her daughter. Keeping in mind the relationship, mother and daughter, the undoubted character of these advances, namely, that they were loans by a daughter to her mother, it would be rather difficult for the mother to have more effectually recognized her obligation to her daughter by having the amount entered in her books as an existing obligation, except by giving a writing to that effect signed by her, or a promissory note. There is no such situation found here as in *Shafer* v. *Pratt* (79 App. Div. 447) and *Cohen* v. *Diamond* (74 Misc. 444) cited in the decision of the learned surrogate. Here, the debtor made the allocation. Her books show it. Nor does the testimony require limiting the effect of these payments to those loans not outlawed at the time they were made, as might be warranted by *Gilbert* v. *Comstock et al.* (93 N. Y. 484). Neither do we have any situation as is suggested in *Crow* v. *Gleason* (141 N. Y. 489, 493) of a mere naked payment of money without anything to show on what account or for what reason the money was paid. Here, the debtor paid an obligation of her creditor, her own daughter. She knew that the payments so made were credited on her own books as a credit in her favor against the entire indebtedness then existing. Her daughter was informed of what her mother had done. Seemingly, the daughter acquiesced in it.

We have therefore reached the conclusion that the circumstances herein shown bring this claim within the rule stated in *Crow* v. *Gleason* (*supra*) and that the evidence fully meets the requirements as expressed in *Lawrence et al.* v. *Harrington* (122 N. Y. 408) and *Brooklyn Bank* v. *Barnaby* (197 N. Y. 210,

225) to remove the bar, even as to the loans which were outlawed at the time these two payments were made.

Nor does the fact that the payments were not made directly to the daughter, but to the Collector of Internal Revenue and the New York State Tax Commission, for her benefit, bring the payments within the purview of *Kirkpatrick* v. *Goldsmith* (81 App. Div. 265). Although the payments were technically made to third persons, nevertheless, they were for the direct benefit of the creditor. In addition, the fact of the payments and the credit of her account with them was made known to the creditor and apparently, she assented. It would be entirely ignoring realities to find that she did not assent. The oral testimony warrants a finding that, acting within the scope of her apparent authority, the decedent's secretary informed the claimant of what had been done. Unfortunately the secretary, when examined, was not asked as to claimant's attitude. However, we believe that an inference of acquiescence is permissible. Every human intendment favors that inference. If the mother had not paid the income taxes, the daughter could have been compelled so to do. Moreover the daughter was being repaid part of her loans.

For the foregoing reasons the decree of the surrogate should be modified and this claim allowed in the sum of $154,992.47. We do not allow any portion of interest accrued up to January 1, 1937, for the reason that at the conclusion of her proof and before the respondent was called upon to make any, seemingly, claimant withdrew any claim for this interest. This waiver was accentuated by claimant's brief and oral argument on this appeal. Nor do we allow interest after January 1, 1937, upon the obligation, although possibly it might be warranted, by reason of the admissions that the loans made by the claimant to the decedent bore interest until January 1, 1937. However we deem it significant on that question that at no time did the decedent indicate any intention to pay interest thereafter by entering as a debit in the interest account any accrued interest.

All concur. Present — TAYLOR, P. J., DOWLING, McCURN, LARKIN and LOVE, JJ.

Decree so far as appealed from modified on the law and facts in accordance with the opinion and as modified affirmed, without costs of this appeal to either party. Certain findings of fact disapproved and reversed.